STATE OF MAINE             BUSINESS AND CONSUMER COURT ✓

Cumberland, ss.

INDIA STREET, INC., d/b/a Magnusson Balfour
Commercial and Business Brokers,

         Plaintiff and Counterclaim Defendant

         v.                       Docket No. BCD-CV-13-27

JOHN F. CHASE,

         Defendant and Counterclaim Plaintiff

         and

CHASE CUSTOM HOMES & FINANCE, INC.,

         Defendant

         v.

CRAIG CHURCH,

         Counterclaim Defendant

## DECISION AND JUDGMENT

This case came before the court for a jury-waived trial July 21, 2014. All parties presented evidence in the form of sworn testimony and exhibits.

Based on the entire record, the court adopts the findings of fact and conclusions of law set forth below, and renders judgment for the Defendants on the Plaintiff's Amended Complaint, and for the Plaintiff and Counterclaim Defendant Craig Church on Defendant John Chase's Counterclaim.

1. Plaintiff India Street, Inc., is a corporation doing business as a commercial real estate brokerage firm under the name Magnusson Balfour Commercial and Business Brokers

1

["Magnusson Balfour" or "Plaintiff"]. Counterclaim Defendant Craig Church is a licensed real estate broker who at all relevant times has been affiliated with Magnusson Balfour.

2. Defendant and Counterclaim Plaintiff John F. Chase is a real estate developer and homebuilder who at all relevant times has done business in the greater Portland area. Mr. Chase is the principal and chief executive officer of Defendant Chase Custom Homes & Finance, Inc., a corporation involved in real estate development and construction activity. He has also been a real estate professional, affiliated with the RE/MAX Alliance agency.

3. At some point during 2011, Chase Custom Homes & Finance, Inc. sold some commercial real estate at a profit, thereby incurring potential tax liability for capital gain on the sale.

4. Under section 1031 of the Internal Revenue Code, a seller of real property or certain other kinds of property may defer recognition of capital gain on the sale by reinvesting the proceeds of the sale in "like kind" property—meaning property of the same type or character as the sold property. Such a transaction under section 1031 is referred to as a "section 1031 exchange" or a "like kind exchange," because the future tax liability for capital gain is transferred or exchanged from the sold property to the purchased like kind property.

5. Section 1031 sets conditions for the sale and subsequent purchase to qualify as a like kind exchange, including the following. First, if the property sold is real estate, then the "like kind" property must also be real estate. Second, section 1031 sets a deadline of 180 days for the reinvestment to occur, meaning that, in the case of real estate, closing on the "like kind" purchase must generally occur within 180 days after the closing on the sale. Third, the like kind property must be purchased in the name of the entity that made the sale, i.e. the entity seeking to defer liability for capital gain tax.

2

6. John Chase decided to take advantage of a section 1031 exchange opportunity in connection with Chase Custom Homes & Finance, Inc.'s sale, and began looking for property to purchase within the 180-day window. To qualify the purchase for purposes of a section 1031 like kind exchange, the purchase would have to be made in the name of Chase Custom Homes & Finance, Inc. because the sale portion of the exchange was made in the name of Chase Custom Homes & Finance, Inc.

7. Sometime in April 2011, Craig Church learned of Mr. Chase's interest in locating property for purposes of a section 1031 exchange. He did not learn this from Mr. Chase. How he learned it and from whom is not clear, but it likely was through another person active in the greater Portland commercial real estate market. In any case, Mr. Church set about getting Mr. Chase to use Magnusson Balfour as his broker in the purchase.

8. Beginning in April or May 2011, Mr. Church developed information regarding commercial properties that Mr. Church understood met Mr. Chase's criteria, and forwarded the information to Mr. Chase. *See* Joint Ex. 2. Mr. Church also arranged showings of some properties that he deemed of potential interest to Mr. Chase. Over the course of their working relationship, Mr. Church showed Mr. Chase about a dozen properties and ranged for drive-by viewings of additional properties. The working relationship also involved many telephone conversations and e-mail messages. All told, Mr. Church spent more than 200 hours assisting Mr. Chase in the search for suitable property to purchase.

9. On May 18, 2011, Mr. Church and Mr. Chase were outside the former Maine Turnpike Authority headquarters building when Mr. Church presented Mr. Chase with a contract intended to formalize Mr. Chase's retention of Magnusson Balfour for purposes of helping him locate suitable commercial properties.

3

10. The contract, titled Exclusive Buyer Representation Agreement [and hereinafter referred to as "the Agreement"], consists of a two-page form with Magnusson Balfour's letterhead at the top of the first page. *See* Joint Ex. 4. The parties to the Agreement are John Chase as "Buyer" and Magnusson Balfour as "Agency." The Agreement had a defined term of six months, from May 18, 2011 to November 17, 2011.

11. Other than a few terms specific to the transaction, such as the names of Mr. Chase and Mr. Church, the commission levels and the start and end dates of the Agreement, the Agreement appears to consist of standard terms and some optional terms that can be made applicable by checking adjacent boxes. On its face, the Agreement was drafted by Magnusson Balfour, with some specific terms inserted by Mr. Church. From the fact that Mr. Chase signed it on the spot without making any changes, it can be inferred that there was no negotiation.

12. The Agreement includes the following paragraphs at section 4(e) and (f):

e. If Buyer receives an interest in a business/business/property by way of purchase, exchange, option, lease or otherwise, which business/property was introduced to Buyer during the term of this Agreement within 12 months of its expiration, a commission will be due Agency unless Buyer in good faith has entered into a subsequent EXCLUSIVE BUYER REPRESENTATION AGREEMENT with another agency. Introduction to the business/property includes receiving any information concerning the business/property, being shown the business/property or presenting offers on the business/property.

f. The commission will be earned when a contract has been accepted by a Seller/Landlord and all contingencies have been satisfied. The commission will be earned even when Buyer pursues the acquisition of business/property on their own without the involvement or assistance of Agency.

Joint Ex. 4 at 1.

13. Mr. Chase evidently signed the Agreement without reading it closely, because he apparently did not realize until months later that the Agreement obligated him to pay

4

Magnusson Balfour a commission on any purchase by him of "introduced" property, whether or not Magnusson Balfour was involved in the purchase.

14. Before and after the Agreement was signed, Craig Church forwarded information about a variety of commercial properties to John Chase, including an office building at 6-8 City Center, Portland. *See* Joint Ex. 2 at 32, Joint Ex. 3 at 3.

15. In an e-mail message to Mr. Chase dated September 24, 2011, Craig Church asked for the name of the seller on the sale as to which Mr. Chase planned to do the section 1031 exchange. Joint Ex. 5 at 2. Mr. Chase responded by writing, "Ok, it was being held in the same name as I will buy it again in."

16. In October 2011, after Mr. Chase apparently had come to realize that the Agreement required him to pay Magnusson Balfour a commission on a purchase, at least under some circumstances, whether or not Magnusson Balfour was involved in the purchase, he made several requests, in the form of e-mail messages to Mr. Church, to be released from the Agreement, or at least from the obligation to pay commissions on any purchases, and expressed the desire to "act as my own agent on further real estate transactions." *See* Joint Ex. 7, 9, 10.

17. In a further e-mail message to Mr. Church of October 23, 2011, John Chase made a detailed proposal for altering the Agreement so as to limit it to "ONE TIME agreement[s]" on specific properties rather than have it apply to all purchases. Joint Ex. 12. The same message also assured Mr. Church that Magnusson Balfour would receive a commission if the purchases of several specified properties transpired—one off Riverside Street in Portland on which Mr. Chase had already made an offer, and the other on Route 302, also known as the Bridgton Road, in Westbrook

18. In an effort to comply with Mr. Chase's request, Mr. Church gave him what appears to be another standard form used by Magnusson Balfour, called Request for Suspension of

5

Listing Agreement. Mr. Chase evidently signed the form, but when Mr. Church submitted the form to Magnusson Balfour, the firm declined to agree to suspend the Agreement.

19. Eventually, the purchase of the property on Route 302 proceeded, with Craig Church acting as buyer's broker in the transaction. The property consisted of two parcels—one was purchased in the name of Chase Custom Homes & Finance, Inc. and the other was in the name of a trust involving members of the Chase family. Neither purchase was made in the name of John Chase. Nonetheless, Magnusson Balfour received a commission on the purchase.

20. Closing on the purchase was in February 2012. Craig Church attended the closing, and while there he learned that Mr. Chase had been involved in the purchase of the 6-8 City Center property in Portland, one of the properties about which he had sent information to John Chase On investigating further, Mr. Church learned that the property had gone under contract in November 2011 and the transaction had closed in December 2011.

21. It turns out that it was the 6-8 City Center property purchase that was the second half of the section 1031 exchange, and not the Westbrook property. One reason was that the amount involved in the section 1031 exchange was more than one million dollars, so the Westbrook purchase would not have enabled a reinvestment of the proceeds of the prior sale. Another reason is that title to a portion of the Westbrook property was taken in the name of the trust rather than in the name of Chase Custom Homes & Finance, Inc.

22. Although Mr. Church had indeed "introduced" the 6-8 City Center property to Mr. Chase by sending him a listing sheet for the property in May 2011 and another in September 2011, Mr. Chase was independently familiar with the property. The law firm that Mr. Chase, Chase Custom Homes & Finance, Inc. and other entities in which he has an interest have customarily used, Hopkinson & Abbondanza, had been a tenant in the building, and was interested in exploring a purchase of the building. Richard Abbondanza, a principal in the law

6

firm, had asked Mr. Chase to help him assess the condition of the building. Eventually, the law firm decided not to proceed with the purchase, but Mr. Chase became interested and Chase Custom Homes & Finance, Inc. entered into a contract to purchase the 6-8 City Center property for $1,500,000 on November 4, 2011.

23. Chase Custom Homes & Finance, Inc.'s purchase of 6-8 City Center was preceded by an extensive due diligence effort, documented in the binder admitted as Joint Exhibit 24.

24. Whether Mr. Chase first became aware that 6-8 City Center was available for purchase through Mr. Abbondanza or through Mr. Church is not clear from the record, because exactly when Mr. Abbondanza asked for Mr. Chase's assistance in evaluating the building was not specified. The record indicates that Mr. Church "introduced" the property to Mr. Chase initially by including a listing sheet at page 32 of a property list created and sent via e-mail on May 14, 2011, four days before the Agreement was signed. *See* Joint Ex. 2 at 33. A similar sheet, reflecting a lower asking price, was sent as page 2 in a set of listing sheets via an e-mail message dated September 23, 2011. *See* Joint Ex. 3 at 3.

25. After learning of the 6-8 City Center purchase, Magnusson Balfour filed this action. Its five-count Amended Complaint alleges breach of contract, *quantum meruit*, unjust enrichment, reformation of contract, and fraud and deceit. Defendants John Chase responded with a two-count counterclaim, for declaratory judgment and fraud and deceit.

*Amended Complaint Count I—Breach of Contract*

26. Plaintiff's breach of contract claim rests on the express contract in this case— memorialized in the Agreement—between Magnusson Balfour and John Chase. Mr. Chase has not breached the Agreement because he never purchased any property under circumstances that would trigger a commission to Magnusson Balfour. Chase Custom Homes & Finance, Inc. did not breach the Agreement because it is not obligated under the Agreement.

7

27. Although Magnusson Balfour argues that the Agreement should be construed to obligate entities controlled by Mr. Chase, such as Chase Custom Homes & Finance, Inc., there is no ambiguity in the Agreement regarding who is the Buyer. Moreover, even if there were a relevant ambiguity on the face of the Agreement, there is no extrinsic evidence that would result in a broader definition of Buyer, in that there was no discussion before or at the time of the making of the contract regarding who or what came within the definition of Buyer.

28. As the drafter of the Agreement, Magnusson Balfour must be held to the terms of its draft. Magnusson Balfour could have drafted the Agreement to define Buyer more broadly, consistent with custom and practice in the real estate brokerage field, by identifying the Buyer as "John Chase and all related entities." Lastly, as the Defendants point out, another reason not to give the Agreement the expansive interpretation Plaintiff advances is that a Maine statute requires a real estate brokerage agreement to be signed by "the client to be charged." 32 M.R.S. § 32177-A(2)(A).

29. Magnusson Balfour argues that Mr. Chase's acknowledgment that he was "tied up" by the Agreement demonstrates his assent to Magnusson Balfour's interpretation. However, the intentions of the parties, to the extent they are admissible at all to vary or contradict the terms of an express contract, are relevant only as of the making of the contract. Mr. Chase plainly did not understand that he was signing an agreement that obligated him to pay commission on any purchases of property "introduced" to him regardless of whether Magnusson Balfour was involved as a broker in the transaction. His reaction later, upon realizing what he had signed, does not bear on his intent as of the making of the contract.

30. For these reasons, the court concludes that Plaintiff has not proved that either Defendant is liable to it under Count I for breach of contract—Plaintiff has not proved either

that Defendant John Chase made a purchase that triggered Plaintiff's right to a commission, or that Defendant Chase Custom Homes & Finance, Inc. is liable to Plaintiff under the Agreement.

*Amended Complaint Count II—Quantum Meruit*

31. Count II of the Amended Complaint seeks recovery in *quantum meruit*, measured by the reasonable value of Magnusson Balfour's services:

> Quantum meruit claims permit recovery pursuant to an implied contract that is inferred from the conduct of the parties. A quantum meruit claim has three elements: that (1) services be rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment. The prevailing plaintiff is entitled to the reasonable value of the services provided. Quantum meruit is a legal, not an equitable, remedy and thus is distinct from the theory of unjust enrichment.

*Dinan v. Alpha Networks, Inc.,* 2013 ME 22, ¶ 20, 60 A.3d 792, 797 (citations omitted). *See also Runnells v. Quinn,* 2006 ME 7, ¶ 10, 890 A.2d 713, 717-18; *Jenkins, Inc. v. Walsh Bros., Inc.,* 2001 ME 98, ¶ 17, 776 A.2d 1229.

32. The existence of an express contract does not necessarily preclude recovery in *quantum meruit,* but such instances often involve work performed on request above and beyond the scope of work in the express contract between the same parties. *See Runnells v. Quinn, supra,* 2006 ME 7 at ¶ 10-11, 890 A.2d at 717-18; *Paffhausen v. Balano,* 1998 ME 47, ¶ 6, 708 A.2d 269, 271. Here, all Magnusson Balfour's services were within the scope of the express contract.

33. Moreover, the services rendered by Magnusson Balfour benefited Chase Custom Homes & Finance, Inc. rather than John Chase, because Mr. Chase did not purchase any property. However, because Maine law requires brokerage agreements to be in writing and signed by the client to be charged, *see* 32 M.R.S. § 32177-A (2)(A), *supra,* it was not reasonable for Magnusson Balfour to expect a commission from a party that had not signed the Agreement.

9

34. Lastly, Plaintiff has been compensated in the form of the commission paid to it on the Route 302 property, and has not shown that the value of its services exceeds the amount by which it has already been compensated.

35. Thus, Plaintiff has failed to prove it is entitled to recover in *quantum meruit* from either Defendant for purposes of Count II.

*Amended Complaint Count III – Unjust Enrichment*

36. Count III of the Amended Complaint seeks recovery against Chase Custom Homes & Finance, Inc. under an alternative theory of unjust enrichment. "Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay, and the 'damages analysis is based on principles of equity, not contract.'" *Paffhausen v. Balano, supra*, 1998 ME 47 at ¶ 6, 708 A.2d at 271, *quoting Aladdin Elec. Assoc. v. Old Orchard Beach*, 645 A.2d 1142, 1145 (Me.1994).

37. For reasons, some of which have been discussed, Plaintiff has not shown it is entitled to recover against either Defendant under the equitable remedy of unjust enrichment. Those reasons include:

- there was an express contract

- Plaintiff has been compensated for its services and has not shown that the benefit of its services to either Defendant exceeded what it has already received

- Plaintiff had no reasonable expectation of being compensated by Chase Custom Homes & Finance, Inc., which was not a signatory to the Agreement

- there is no injustice to be remedied

*Amended Complaint Count IV—Reformation*

38. Count IV seeks for the Agreement between Magnusson Balfour and John Chase to be reformed to include Chase Custom Homes & Finance, Inc. as a Buyer obligated under the

10

Agreement. A party "seeking reformation must prove the existence of mutual mistake by clear and convincing evidence. *Yaffie v. Lawyers Title Ins. Corp.*, 1998 ME 77, ¶8, 710 A.2d 886, 888, citing *Day v. McEwen*, 385 A.2d 790, 794 (Me.1978).

39. Magnusson Balfour did not prove any mutual mistake. Mr. Church and Mr. Chase may have been mistaken in some respects, but in different respects. Based on the fact that he listed Mr. Chase and only Mr. Chase as the Buyer, Mr. Church appears to have assumed, mistakenly, that Mr. Chase himself would be making the section 1031 purchase. Mr. Chase, on the other hand, appears to have assumed, mistakenly, that the Agreement called for a commission to be paid only if Magnusson Balfour was actively involved in the closing on the purchase. Neither one misled the other or caused the mistake. Mr. Church failed to ask the right question until September, and Mr. Chase failed to read the Agreement carefully.

40. To prevail on its reformation claim, Plaintiff Magnusson Balfour had to show by clear and convincing evidence, i.e. to a high probability, that all parties to the Agreement intended Chase Custom Homes & Finance, Inc. to be included as a Buyer and that its absence as a named Buyer was a mutual mistake. It has not done so.

*Amended Complaint Count V—Fraud & Deceit*

41. Count V of the Amended Complaint charges that the Defendants engaged in fraud and deceit. Fraud and deceit both must be proved by clear and convincing evidence. *See Randall v. Conley*, 2010 ME 68, ¶12, 2 A.3d 328, 331; *Coffin v. Dodge*, 146 Me. 3, 6, 76 A.2d 541, 543.

42. In Count V of its Amended Complaint, Plaintiff Magnusson Balfour contends that John Chase engaged in fraud and deceit in that he "misrepresented his role as an agent for Chase Custom Homes & Finance, Inc. in order to induce Plaintiff into entering into a contract with him individually instead of Chase Custom Homes & Finance, Inc. & Finance, Inc." Count

11

V also says that John Chase "purposefully and maliciously led Plaintiff to provide services which would benefit Chase Custom Homes & Finance, Inc., whilst knowing that the Contract was with the wrong party."

43. The import of the first of these two allegations is not entirely clear, at least to the court: does it mean that Mr. Chase purported to act as an agent for Chase Custom Homes & Finance, Inc. when he really was acting in his individual capacity or does it mean he purported to act as an individual when really he was acting as an agent for Chase Custom Homes & Finance, Inc.? In either case, Plaintiff has not proved that Mr. Chase misled Mr. Church or Magnusson Balfour. The question of who or what would be make the purchase needed to complete the section 1031 exchange was not asked until September 2011. The evidence suggests that Mr. Church simply put Mr. Chase's name on the Agreement and brought it to the parking lot where it was signed. If Plaintiff thought it was dealing with Chase Custom Homes & Finance, Inc., it could have added Chase Custom Homes & Finance, Inc. as a named Buyer.

44. As to the second allegation—that John Chase led Plaintiff to provide services to Chase Custom Homes & Finance, Inc. knowing that the Agreement was with the wrong party, Mr. Chase may or may not have recalled, at the time he signed the Agreement, that the section 1031 exchange would not involve him individually as the purchaser. As noted above, he appears to have signed the Agreement without understanding it fully. No findings regarding his state of mind at the signing are possible, at least by the clear and convincing standard. But what is clear is that Mr. Chase did not induce Plaintiff to list him rather than Chase Custom Homes & Finance, Inc. as the named Buyer in the Agreement.

45. Plaintiff has not proved its fraud and deceit claim.

46. The analysis turns to Defendant John Chase's Counterclaim.

12

*Counterclaim Count I—Declaratory Judgment*

47. Count I of Defendant Chase's Counterclaim seeks a declaratory judgment on a variety of points. He seeks a declaratory judgment "to remove any claim of wrongdoing or breach by Chase," to declare that Chase and Chase Custom Homes & Finance, Inc. do not owe Plaintiff anything, and to declare the Agreement null and void or in the alternative strictly construed, among other requests.

48. Justice Godfrey has observed, "Generally speaking, whether a declaratory judgment should be issued rests in the sound discretion of the trial court. The discretion to be exercised is of a judicial nature, not arbitrary but based on good reason. In exercising that discretion, the trial court must decide whether the adjudication will serve some useful purpose." *Eastern Fine Paper, Inc. v. Garriga Trading Co., Inc.*, 457 A.2d 1111, 1112-13 (Me. 1983) (Godfrey, J.) (citations omitted).

49. In the court's view, granting declaratory relief would serve no useful purpose in this case. The court's findings, conclusions and rulings on the five counts of the Amended Complaint are sufficient to adjudicate the issues. Moreover, Defendant Chase is not entitled to affirmative exoneration or ratification of his actions—the court has decided the claims that were brought against him and Chase Custom Homes & Finance, Inc., and the civil justice process does not need to go further than that. The court declines to grant declaratory relief.

*Counterclaim Count II—Fraud & Deceit*

50. Defendant Chase has the burden to prove his fraud and deceit claims by clear and convincing evidence, but has failed to prove that either Plaintiff or Craig Church deceived or defrauded him in any way. His evident misunderstanding of the Agreement was due to his failure to read it carefully before he signed it.

13

IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1. Judgment shall be entered for the Defendants on the Plaintiff's Amended Complaint.

2. Judgment shall be entered for the Plaintiff and for Counterclaim Defendant Craig Church on Defendant John Chase's Counterclaim.

3. Regarding which party or parties prevailed for purposes of awarding costs under M.R. Civ. 54(d), the court focuses, not on who prevailed on how many counts or theories, but on who prevailed on the foundational issue of whether the Agreement entitled Plaintiff to a commission for Chase Custom Homes & Finance, Inc.'s purchase of 6-8 City Center. On that issue the Defendants prevailed. Defendants are awarded their costs against Plaintiff.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this Decision and Judgment by reference in the docket.

Dated August 15, 2014

A. M. Horton
Justice, Business and Consumer Court

14

India Street, Inc., d/b/a Magnusson Balfour Commercial and Business Brokers v. John F. Chase, Chase Custom Homes & Finance, Inc.
BCD-CV-13-27


**India Street, Inc., d/b/a Magnusson Balfour Commercial and Business Brokers**
        **Plaintiff**

        Counsel:                         Patrick Thornton, Esq.
                                         361 US Route 1
                                         Falmouth, ME 04105


**John F. Chase, Chase Custom Homes & Finance, Inc.**
        **Defendant and Counterclaim Plaintiff**

        Counsel:                         Timothy Bryant, Esq.
                                         PO Box 9546
                                         One City Center
                                         Portland, ME 04112-9546


**Craig Church**
        **Counterclaim Defendant**
        Counsel:                         Patrick Thornton, AAG
                                         361 US Route 1
                                         Falmouth, ME 04105